(No. 97317.—

THE WAUCONDA FIRE PROTECTION DISTRICT, Appellee, v. STONEWALL ORCHARDS, LLP, *et al.* (Lake County, Illinois, Appellant).

*Opinion filed March 24, 2005.*

Michael J. Waller, State's Attorney, of Waukegan (Daniel L. Jasica and Joseph B. Chervin, Assistant State's Attorneys, of counsel), for appellant.

Mary M. LaSata Spiegel, of the Law Offices of David R. Gervais, of Crystal Lake, for appellee.

Shawn P. Flaherty and Robert W. Trevarthen, of Ottosen, Trevarthen, Britz, Kelly & Cooper, Ltd., of Wheaton, for *amici curiae* The Illinois Association of Fire Protection Districts and The Northern Illinois Alliance of Fire Protection Districts.

JUSTICE GARMAN delivered the opinion of the court:

Plaintiff, the Wauconda Fire Protection District (District), sought declaratory and injunctive relief against defendants, Lake County, Illinois (County), and Stonewall Orchards, LLP (Stonewall), after the County approved new construction by Stonewall despite Stonewall's noncompliance with a District ordinance. Defendants filed motions to dismiss, which the circuit court of Lake County granted. The District appealed, and the appellate court affirmed in part, reversed in part, and remanded the cause to the circuit court. 343 Ill. App. 3d 374. We granted leave to appeal. 177 Ill. 2d R. 315. The issues now before us are whether this court has jurisdiction to hear the matter before it and, if so, whether the District's ordinance is enforceable against Stonewall. We hold that jurisdiction is proper, and that the District's ordinance is enforceable. Accordingly, we affirm the judgment of the appellate court, which remanded the cause for further proceedings.

## BACKGROUND

Stonewall, a private entity, operates a golf course located within the common boundaries of unincorporated Lake County and the District. In November 1999, Stonewall submitted plans to the County and the District for construction of a clubhouse on the golf course. The initial plans provided for a sprinkler system. A revised

version of the plans did not. The County approved the revised plans and issued a building permit to Stonewall in October 2001.

During construction of the clubhouse, the District informed Stonewall that a District fire protection ordinance required the clubhouse to have a sprinkler system. The ordinance provides:

"An automatic fire sprinkler system, approved by the Wauconda Fire Protection District, shall be installed in all new construction of buildings of the following use groups as defined by the BOCA Building Code, 1993 Edition; Assembly, Business, Education, Factory and Industrial, High Hazard, Institutional, Mercantile, Residential R1, R2, R3, and Storage." Wauconda Fire Protection District Fire Sprinkler Ordinance, No. 98—0—5 (eff. November 27, 1998).

Unlike the District's sprinkler ordinance, the County's building code does not require the installation of a sprinkler system in the clubhouse. According to the County's code, structures such as the clubhouse, which fall into the "Assembly" use group, are only required to contain an "automatic fire suppression system" where the "fire area exceeds 10,000 square feet." BOCA National Building Code 1999, § 904.2, as amended by Lake County Ordinance Adopting the BOCA National Building Code 1999 (eff. August 8, 2000).[1]

In June 2002, around the time the clubhouse was

---

[1]The record in this case does not specifically mention which section of the County's building code governs installation of the sprinkler system in the clubhouse. The parties agree, and the appellate court noted, however, that the District's ordinance requires installation of a sprinkler system, and the County's building code does not. Moreover, the County does not dispute the assertion made by the District in its response brief that the County requires buildings exceeding 10,000 square feet in area to be equipped with a sprinkler system. After reviewing the BOCA National Building Code 1999 (BOCA Code) and the amendments to it adopted by Lake County, we have determined that section 904.2 of the BOCA

nearing completion, the District filed a complaint in the Lake County circuit court seeking to enjoin the County from issuing Stonewall a temporary occupancy permit for the clubhouse, and to enjoin Stonewall from occupying the clubhouse, until Stonewall installed a sprinkler system. The District cited section 11 of the Fire Protection District Act (Act) (70 ILCS 705/11 (West 2002)) as the basis for its authority to adopt and enforce its fire protection ordinance.

The County and Stonewall filed motions to dismiss. They argued the District had no authority under section 11 to adopt or enforce its sprinkler ordinance. Section 11 states:

> "The board of trustees of any fire protection district incorporated under this Act has the power and it is its legal duty and obligation to provide as nearly adequate protection from fire for all persons and property within the said district as possible and to prescribe necessary regulations for the prevention and control of fire therein. The board of trustees may provide and maintain life saving and rescue equipment services and facilities, including an emergency ambulance service. Except in cities having a population of 500,000 or more inhabitants *and except in municipalities in which fire prevention codes have been adopted,* the board of trustees has the express power to adopt and enforce fire prevention codes and standards parallel to national standards." (Emphasis added.) 70 ILCS 705/11 (West 2002).

Specifically, the County and Stonewall argued the County is a municipality for purposes of section 11, and because the County has adopted a fire prevention code, the County's code, not the District's ordinance, applies to Stonewall. Alternatively, the County argued it could not be compelled to enforce the District's ordinance by with-

---

Code, as amended by Lake County's ordinance to apply to buildings of 10,000 square feet, rather than buildings of 12,000 square feet, is the specific section of the County's building code at issue in this case.

holding permission to occupy the clubhouse from Stonewall, because section 11 does not provide fire protection districts with the authority to require other governmental entities to enforce district regulations.

While the proceedings were pending against the County and Stonewall, the County issued Stonewall a temporary occupancy permit. Thereafter, the District filed an amended complaint. The District sought to enjoin the County from issuing a final certificate of occupancy to Stonewall. In addition, it sought a declaratory judgment that the District has the authority to enact regulations within unincorporated Lake County, and that the District's sprinkler ordinance is enforceable against Stonewall.

The circuit court granted defendants' motions to dismiss, and the District filed notice of appeal. On appeal, the appellate court, with one justice dissenting, affirmed the judgment of the circuit court in part, reversed it in part, and remanded the cause for further proceedings. 343 Ill. App. 3d 374, 380. The appellate court reversed the judgment of the circuit court as to the injunctive relief sought against Stonewall and the declaratory relief sought against both defendants. It held that the District's sprinkler ordinance is enforceable against Stonewall, because the County is not a municipality for purposes of section 11. 343 Ill. App. 3d at 379. The court reasoned that other sections of the Fire Protection District Act use the word "municipality" to refer to cities, villages, and incorporated towns, not counties, and that the definition of "municipalities" adopted by the Statute on Statutes (Statute) (5 ILCS 70/1.27 (West 2002)) is consistent with that understanding of the term. 343 Ill. App. 3d at 378-79. As to the injunctive relief sought against the County, the appellate court affirmed the judgment of the circuit court, holding that the District must enforce its ordinance against Stonewall

without seeking enforcement by the County. 343 Ill. App. 3d at 380. The appellate court noted that while section 11 gives fire protection districts the authority to enact and enforce fire prevention regulations, the statute does not indicate that the legislature intended a fire protection district to have the power to require a county to withhold an occupancy permit. 343 Ill. App. 3d at 380.

The County filed an "affidavit of intent" to file a petition for leave to appeal to this court with the appellate court on October 22, 2003, 20 days after entry of the appellate court's judgment. On November 6, 2003, within 35 days after entry of the judgment, the County filed its petition for leave to appeal with this court's clerk. The same day, the clerk informed the County its petition could not be accepted by the court because the October 22, 2003, "affidavit of intent" had not been sworn and subscribed by a notary public. The County immediately filed a motion seeking leave to file its petition for leave to appeal *instanter*. On November 19, 2003, an order was entered granting the County's motion, the effect of which was to extend the County's deadline for filing its petition for leave to appeal to November 6, 2003, despite the invalidity of its affidavit of intent. We later granted the County's petition for leave to appeal pursuant to Supreme Court Rule 315. 177 Ill. 2d R. 315.

## ANALYSIS

The County challenges the appellate court's interpretation of section 11. Before addressing the statutory interpretation issue on the merits, we must consider the District's argument that this court does not have jurisdiction to hear this matter because the County failed to file a timely petition for leave to appeal.

### I. Supreme Court Rule 315

At the time the County filed its "affidavit of intent"

to file a petition for leave to appeal to this court,[2] Supreme Court Rule 315(b) stated, in part:

"[A] party seeking leave to appeal must file the petition for leave in the Supreme Court within 21 days after entry of the judgment of the Appellate Court, or within the same 21 days file with the Appellate Court an affidavit of intent to file a petition for leave, and file the petition within 35 days after the entry of such judgment. *** The Supreme Court, or a judge thereof, on motion, may extend the time for petitioning for leave to appeal, but such motions are not favored and will be allowed only in the most extreme and compelling circumstances." 177 Ill. 2d R. 315(b).

In the past, we have referred to this familiar rule in jurisdictional terms. See, *e.g.*, *A.J. Maggio Co. v. Willis*, 197 Ill. 2d 397, 403-04 (2001); *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490 (2002). In *A.J. Maggio*, we held we did not have jurisdiction to hear the plaintiff's appeal because the plaintiff failed to file a petition for leave to appeal within 21 days of the entry of the appellate court's judgment on rehearing. *A.J. Maggio*, 197 Ill. 2d at 403-04. Likewise, in *Roth*, citing *A.J. Maggio*, we dismissed the cause before us on the ground that leave to appeal was improvidently granted. *Roth*, 202 Ill. 2d at 497. There, because the defendant's affidavit of intent had no legal effect, it was insufficient to extend the defendant's time for filing a petition for leave to appeal, and without the extension, the defendant's petition was untimely. *Roth*, 202 Ill. 2d at 497.

The District now contends that because the County's

---

[2]Rule 315(b) was amended, effective December 5, 2003, to allow use of a "verification by certification under section 1—109 of the Code of Civil Procedure of intent to file a petition for leave to appeal" in lieu of an affidavit. See Official Reports Advance Sheet No. 26 (December 24, 2003), R. 315(b), eff. December 5, 2003. However, we need not decide whether the County's notice in this matter would have been in compliance with the amended rule, as the County's notice was filed prior to the effective date of the amendment.

"affidavit of intent" was defective, and therefore had no legal effect, the County's deadline for filing its petition for leave to appeal expired 21 days after the appellate court entered its October 22, 2003, judgment. Accordingly, the District argues this court had no authority to grant the County an extension for filing its petition for leave to appeal outside the applicable 21-day filing period.

The concept of jurisdiction encompasses a broad array of specific doctrines that define and limit the power of courts. See, *e.g.*, Black's Law Dictionary 867 (8th ed. 2004) (defining various types of jurisdiction). In a general sense, jurisdiction refers to "[a] court's power to decide a case or issue a decree." Black's Law Dictionary 867 (8th ed. 2004). For this court, as well as the appellate court and the circuit courts, the basis of that power is the Illinois Constitution.

According to the Illinois Constitution, circuit courts have original jurisdiction in "all justiciable matters," except when the supreme court has original and exclusive jurisdiction. Ill. Const. 1970, art. VI, § 9. The appellate court may exercise original jurisdiction when necessary to complete the determination of any case on review. Ill. Const. 1970, art. VI, § 6. Appeals to the appellate court from final judgments of the circuit courts are a matter of right, except when a case is directly appealable to the supreme court or the judgment in question is a judgment of acquittal after a trial on the merits in a criminal case. Ill. Const. 1970, art. VI, § 6. As to the jurisdiction of the supreme court, the Constitution provides that the supreme court may exercise original jurisdiction in cases relating to revenue, *mandamus*, prohibition, or *habeas corpus* (Ill. Const. 1970, art. VI, § 4(a)), and that it has original and exclusive jurisdiction over actions concerning the redistricting of the General Assembly (Ill. Const. 1970, art. IV, § 3(b)) and the ability of the Governor to serve or resume office (Ill. Const. 1970, art. V, § 6(d)).

Appeals to the supreme court from circuit court judgments imposing the death penalty are a matter of right. Ill. Const. 1970, art. VI, § 4(b). In addition, appeals to the supreme court from the appellate court are a matter of right if a federal or state constitutional question arises for the first time in and as a result of the action of the appellate court, or if the appellate court certifies that a case decided by it involves a question of such importance that the supreme court should decide the case. Ill. Const. 1970, art. VI, § 4(b).

The Constitution also vests the supreme court with supervisory authority over all courts. Ill. Const. 1970, art. VI, § 16. As part of this supervisory authority, the supreme court may promulgate rules governing the proceedings of the courts of this state. See Ill. Const. 1970, art. VI, § 16. The Constitution specifically enables the supreme court to create rules governing appeals from the appellate court (Ill. Const. 1970, art. VI, §§ 4(c), 6)) and direct appeals from the circuit courts in cases other than those involving the death penalty (Ill. Const. 1970, art. VI, § 4(b)).

Collectively, these constitutional provisions define the subject matter jurisdiction of the circuit courts, the appellate court, and this court, and allow this court to establish procedural rules governing the exercise of that jurisdiction. The circuit courts and the appellate court have no discretion to excuse compliance with the rules this court establishes pursuant to its supervisory authority. See, *e.g.*, *Mitchell v. Fiat-Allis, Inc.*, 158 Ill. 2d 143, 150 (1994) ("neither the trial court nor the appellate court has the 'authority to excuse compliance with the filing requirements of the supreme court rules governing appeals' "), quoting *In re Smith*, 80 Ill. App. 3d 380, 382 (1980). In *Mitchell*, this court held the appellate court had no jurisdiction over an appeal where the initial 30-day period for filing notice of appeal under Rule 303(a)

(155 Ill. 2d R. 303(a)) had elapsed, and where the appellant failed to file a motion for leave to file a late notice of appeal pursuant to Rule 303(e) (155 Ill. 2d R. 303(e)). *Mitchell*, 158 Ill. 2d at 148-49. This court also approved the appellate court's reasoning that the circuit court lacked the authority to extend the time for filing a notice of appeal, because after 30 days had elapsed from the time the circuit court entered its final order, the circuit court lost jurisdiction over the matters resolved in that order. *Mitchell*, 158 Ill. 2d at 149-50. Similarly, in *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536 (1984), this court held the appellate court had no jurisdiction over an appeal where the appellant's notice of appeal was not timely filed because the appellant filed a motion to reconsider prior to the date on which judgment was formally entered by the circuit court, and the motion did not extend the time within which the appellant could file his notice of appeal. *Archer Daniels*, 103 Ill. 2d at 538-39. In short, as applied to the circuit courts and the appellate court, our rules are jurisdictional and must be strictly observed.

On the other hand, this court's supervisory authority includes the discretion for this court to excuse compliance with the rules it establishes in accordance with that authority. While our rules govern the exercise of our jurisdiction, they do not place limitations upon it. Only the Illinois Constitution limits this court's subject matter jurisdiction. Our rules thus do not require this court to automatically dismiss a matter when a litigant fails to strictly comply with their provisions.

We acknowledge that in *A.J. Maggio* we noted "[o]ur rules demand strict compliance in the timely filing of appeals or affidavits of intent as a matter of jurisdiction." *A.J. Maggio*, 197 Ill. 2d at 403. We also acknowledge reaffirming this proposition in *Roth*. *Roth*, 202 Ill. 2d at 496-97. Indeed, we do expect litigants to comply with our

rules. As we expressed in *Roth*, "our rules would have little force if the legal community perceived that we, as a court, do not enforce the rules or tailor them to fit the exigencies of the moment. \*\*\* [W]e must emphasize that the supreme court rules are rules of procedure and that it is incumbent upon litigants to follow them." *Roth*, 202 Ill. 2d at 494-95. We do not, in any way, retreat from this position. We clarify, however, that our rules regarding the filing of appeals and affidavits require compliance "as a matter of jurisdiction" merely in the sense that we will, within our discretion, enforce the consequences of noncompliance to preserve the orderly exercise of our constitutionally defined jurisdiction. They are not a jurisdictional bar in the sense that a litigant's noncompliance automatically deprives us of the power to adjudicate a matter brought before us. Therefore, we reject the District's argument that we had no authority to allow the County to file its petition for leave to appeal after the 21-day filing period had elapsed. The extension was appropriate, and this case is now properly before this court.

We further note that this case is factually distinguishable from *A.J. Maggio* and *Roth*. Neither of those cases presented circumstances in which a litigant requested leave to file its petition for leave to appeal *instanter* after expiration of the filing deadline. In *A.J. Maggio*, the petitioner filed a second petition for rehearing with the appellate court without regard for the possibility the second petition would not stay the time period for filing a petition for leave to appeal. *A.J. Maggio*, 197 Ill. 2d at 399-400. Likewise, in *Roth*, the petitioner took no measures to inform this court its affidavit of intent was defective. *Roth*, 202 Ill. 2d at 492.

Moreover, this case is not one in which the County simply ignored the rules of this court. The County did not, for instance, allow the 35-day filing deadline to expire without filing its petition for leave to appeal and

then file a motion to extend the time for petitioning for leave to appeal after the deadline. Here, to the contrary, the County filed its petition for leave to appeal within the 35-day period allowed after the filing of a valid affidavit of intent. Then, immediately upon discovering the defect in its "affidavit," the County notified this court of its situation and requested relief.

II. The Meaning of "Municipalities" in Section 11

We now turn to the issue of whether the term "municipalities" in section 11 of the Fire Protection District Act includes counties. We review this statutory interpretation issue *de novo*. See *Advincula v. United Blood Services*, 176 Ill. 2d 1, 12 (1996). The primary objective of statutory interpretation is to determine and effectuate the intent of the legislature. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). This inquiry properly begins by examining the language of the statute at issue. *Nottage v. Jeka*, 172 Ill. 2d 386, 392 (1996). In the absence of a statutory definition, a term within a statute must be given its ordinary and popularly understood meaning. *In re D.F.*, 201 Ill. 2d 476, 496 (2002).

The County argues that counties are "municipalities" for purposes of section 11 and that, as a result, the County's fire prevention regulations, not those of the District, apply to Stonewall. The term "municipalities" is not defined in the Fire Protection District Act. Accordingly, the County argues this court should interpret section 11 in light of section 5—1063 of the Counties Code (55 ILCS 5/5—1063 (West 2002)) and the definition of "municipality" in the Municipal Adoption of Codes and Records Act (Codes and Records Act) (50 ILCS 220/1(a) (West 2002)). Section 5—1063 of the Counties Code grants counties the authority to adopt regulations governing building construction, including fire prevention regulations. The Codes and Records Act authorizes a municipality to adopt a national fire prevention code by

reference and defines "[m]unicipality" as "any fire protection district or other political subdivision of the State of Illinois having power to legislate on the subject matters mentioned in this Act." 50 ILCS 220/1(a) (West 2002). We find the Counties Code and the Codes and Records Act to be inapposite because of the direct applicability of the definition of "municipalities" in the Statute on Statutes (5 ILCS 70/1.27 (West 2002)) to this case.

The Statute on Statutes must be observed in interpreting a statute unless doing so "would be inconsistent with the manifest intent of the General Assembly or repugnant to the context of the statute." 5 ILCS 70/1 (West 2002). The Statute adopts the definition of "municipalities" set forth in the Illinois Constitution (5 ILCS 70/1.27 (West 2002)), which provides:

" 'Municipalities' means cities, villages and incorporated towns. 'Units of local government' means counties, municipalities, townships, special districts, and units, designated as units of local government by law, which exercise limited governmental powers or powers in respect to limited governmental subjects, but does not include school districts." (Emphasis added.) Ill. Const. 1970, art. VII, § 1.

This definition of "municipalities" excludes counties. Counties fall into the more general category of "units of local government," which, notably, includes municipalities but treats them as distinct from counties.

In this case, applying the Statute on Statutes' definition of "municipalities" to interpret the meaning of "municipalities" in section 11 is consistent with the manifest intent of the legislature. The purpose of the Fire Protection District Act is to protect the health, safety, and welfare of the public by ensuring the provision of adequate fire prevention and control services. See 70 ILCS 705/1 (West 2002). Interpreting the exception in section 11 that exempts certain cities and municipalities from the coverage of the Act not to include counties

comports with the legislature's intent to ensure the provision of fire prevention and control services. Under this interpretation, in some unincorporated areas, both fire protection district and county fire protection regulations will apply, not simply one of the two. This potential double coverage is consistent with ensuring adequate fire protection.

Applying the Statute on Statutes' definition of "municipalities" to interpret the meaning of "municipalities" in section 11 is also consistent with the context of the Fire Protection District Act. Various sections of the Act refer to municipalities and counties as distinct entities. See, *e.g.*, 70 ILCS 705/1.02 (West 2002) (addressing apportionment between municipalities and counties of the costs of elections to organize fire protection districts); 70 ILCS 705/11e (West 2002) (distinguishing between county and municipal address number systems for fire protection districts); 70 ILCS 705/14.14 (West 2002) (distinguishing between counties and municipalities in addressing disconnection from one fire protection district and transfer to another). In addition, various sections of the Act use the word "municipality" to refer specifically to cities, villages, and incorporated towns. See, *e.g.*, 70 ILCS 705/9 (West 2002) (addressing the subject of "[a]cquiring apparatus from a municipality" in terms of acquiring it from "any city or village or incorporated town"); 70 ILCS 705/11a (West 2002) (indicating a fire protection district may contract with any city, village, or incorporated town adjacent to it "for fire protection service to be furnished by *** such municipality"); 70 ILCS 705/18 (West 2002) (referring to a city, village, or incorporated town as a "municipality" in the context of disconnecting territory from a fire protection district); 70 ILCS 705/19 (West 2002) (referring to a city, village, or incorporated town as an "annexing municipality" in the context of disconnecting territory from a fire protection

district); 70 ILCS 705/21 (West 2002) (referring to a city, village, or incorporated town as "such municipality" in the context of disconnecting territory from a fire protection district). Taken together, these sections of the Fire Protection District Act provide strong evidence the legislature did not intend to categorize counties as "municipalities" for purposes of the Act, but rather intended "municipalities" to include cities, villages, and incorporated towns. Therefore, the Statute's definition of "municipalities" as cities, villages, and incorporated towns is consistent with the context of the Act itself.

In sum, we agree with the District and the appellate court that section 11's reference to "municipalities" does not include counties. For purposes of section 11, "municipalities" refers to cities, villages, and incorporated towns, not counties. Under this interpretation, the County is not a municipality, and the District's sprinkler ordinance is enforceable against Stonewall.

### III. Equal Protection

The County further argues that interpreting "municipalities" to exclude counties creates a classification that violates the equal protection guarantee of the United States Constitution. See U.S. Const., amend. XIV. Specifically, the County asserts that this interpretation creates two classes of property owners treated unequally on the basis of where they reside. Individuals and businesses whose property is located in cities, villages, and incorporated towns are not obligated to comply with a fire protection district's regulations as long as their municipality has adopted its own fire prevention code. On the contrary, individuals and businesses whose property is located in the unincorporated areas of a county are obligated to comply with a fire protection district's regulations, even if, as in this case, the county in which they reside has adopted a comprehensive fire prevention code. The County reasons that, under this interpretation

of the statute, residents of unincorporated areas that must comply with fire protection district regulations are forced to bear a greater economic burden than residents of cities, villages, and incorporated towns.

In conducting an equal protection analysis, we apply the same standards under both the United States Constitution and the Illinois Constitution. *Nevitt v. Langfelder*, 157 Ill. 2d 116, 124 (1993). The guarantee of equal protection requires the government to treat similarly situated individuals in a similar fashion. *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 322 (1996). It does not prevent the government from drawing distinctions between different categories of people in enacting legislation, but it does prohibit the government from doing so on the basis of criteria wholly unrelated to the legislation's purpose. *Jacobson*, 171 Ill. 2d at 322. Where legislation does not affect a fundamental right or involve a suspect or quasi-suspect classification, the appropriate level of scrutiny is the rational basis test. *Nevitt*, 157 Ill. 2d at 125. Under the rational basis test, a court's review of a classification is limited and deferential. *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 37 (1996). The court simply inquires whether the means the statute employs to achieve its purpose are rationally related to that purpose. *Jacobson*, 171 Ill. 2d at 323. If any set of facts can reasonably be conceived to justify the classification, it will not be construed as violating the equal protection guarantee. *Miller*, 196 Ill. 2d at 59.

Section 11 of the Fire Protection District Act does not affect a fundamental right or involve a suspect or quasi-suspect classification. Therefore, section 11 is subject to the rational basis test. The purpose of the Fire Protection District Act, as mentioned, is to protect the public by ensuring the provision of adequate fire prevention and control services. See 70 ILCS 705/1 (West 2002). If the term "municipalities" is interpreted to mean cit-

ies, villages, and incorporated towns, then section 11 creates a residency classification, in that residents of cities, villages, and incorporated towns with fire protection codes are not obligated to bear the cost of complying with a fire protection district's regulations, but residents of the unincorporated areas of a county are obligated to do so. Our inquiry is thus whether this residency classification is rationally related to the purpose of protecting the health, welfare, and safety of the public by providing adequate fire prevention and control services. We find it is.

In distinguishing between counties and municipalities in section 11, the legislature could reasonably have concluded that, as a general matter, counties are less likely than municipalities to have comprehensive fire prevention regulations in place, and that, as a result, the residents of unincorporated areas run a greater risk of being inadequately protected from fire-related hazards than the residents of municipalities. To minimize the risk of inadequate protection, it was reasonable for the legislature to devise a fire protection plan that, in some instances, requires residents of unincorporated areas to comply with both fire protection district and county fire prevention regulations. Accordingly, the legislature's decision to exempt only cities, villages, and incorporated towns with fire prevention codes from the authority of fire protection districts—and thereby require unincorporated area residents, but not municipal residents, to comply with fire protection district regulations—was reasonably related to the legitimate purpose of protecting the health, welfare, and safety of the public by providing adequate fire prevention and control services. Therefore, interpreting "municipalities" to exclude counties does not raise any doubt as to the constitutionality of section 11.

## IV. Injunctive Relief

We have determined conclusively that, for purposes

of section 11, "municipalities" does not include counties. As a result, the District had the authority to enact its sprinkler ordinance within unincorporated Lake County, and the ordinance is enforceable against Stonewall. There remains to be decided the remedial issue of whether the circuit court correctly denied the District's request to enjoin the County from granting a certificate of occupancy to Stonewall. Neither party explicitly addressed this issue in the briefs submitted to this court, and we see no reason to disturb the conclusion of the circuit court and the appellate court that issuing an injunction against the County would be inappropriate in this case. If the County has determined the clubhouse meets the requirements for obtaining a certificate of occupancy, then it has the authority to issue the certificate. See 55 ILCS 5/5—1063 (West 2002) (county board may require occupants of commercial buildings outside limits of cities, villages, and incorporated towns to obtain occupancy permits from county). The District can enforce its sprinkler ordinance on its own accord without interfering with the County's enforcement of its fire prevention regulations.

The issue of injunctive relief might be different if this case presented a situation in which a fire protection district regulation conflicted with a county regulation. We note, however, that it does not. Both regulations at issue here can be applied without conflict. The District's ordinance requires the installation of a sprinkler system in the clubhouse, because the clubhouse falls within the set of use groups listed in the ordinance. See Wauconda Fire Protection District Fire Sprinkler Ordinance No. 98—0—5 (eff. November 27, 1998). The County's building code, on the other hand, does not require a sprinkler system, because the clubhouse does not exceed 10,000 square feet in area. See BOCA National Building Code 1999, § 904.2, as amended by Lake County Ordinance

Adopting the BOCA National Building Code 1999 (eff. August 8, 2000). The regulations establish different fire protection standards for buildings falling within the same "Assembly" use group. In this instance, however, the District's regulation is simply more stringent than that of the County. We need not resolve the question of what happens if a fire protection district regulation and a county regulation conflict.

## CONCLUSION

We hold that the District's ordinance is enforceable against Stonewall. The reference to "municipalities" in section 11 does not include counties, and this interpretation of the statute does not raise any doubt as to its constitutionality. The circuit court, however, was correct to deny the District's request to enjoin the County from issuing a certificate of occupancy to Stonewall. Accordingly, we affirm the appellate court's judgment, which remanded this matter to the circuit court for further proceedings.

*Appellate court judgment affirmed.*

JUSTICE KILBRIDE, specially concurring:

I concur in the conclusion that this court has jurisdiction to review this appeal and the ultimate holding that the District's ordinance is enforceable against Stonewall. While I agree with the outcome of this appeal, I write separately because I believe the County's affidavit of intent to file a petition for leave to appeal complies with Rule 315(b).

The "Affidavit of Intent to File Petition for Leave to Appeal to the Illinois Supreme Court" in this case reads as follows:

> "Petitioner-Appellee, LAKE COUNTY, ILLINOIS, by and through its attorneys MICHAEL J. WALLER, State's Attorney of Lake County, and DANIEL L. JASICA and JOSEPH B. CHERVIN, Assistant State's Attorneys, hereby

states that it intends to file a Petition for Leave to Appeal to the Illinois Supreme Court from the Order dated October 2, 2003.

JOSEPH B. CHERVIN hereby states *under oath* that it is the intention of the Petitioner-Appellee to file a Petition for Leave to Appeal to the Illinois Supreme Court." (Emphasis added.)

The document was signed by Joseph B. Chervin, one of the assistant State's Attorneys representing the County.

Today's opinion contains no analysis of the specific language of this affidavit. Rather, it assumes that the affidavit was noncompliant with Rule 315(b) because the attorney's signature was not notarized.

In *Robidoux*, this court found that an affidavit stating it was signed "under oath" met the requirements of Rule 191(a). *Robidoux v. Oliphant*, 201 Ill. 2d 324, 340-43 (2002). In *Roth*, I concurred with the majority's holding that the affidavit of intent to file petition for leave to appeal "[was] not an affidavit within the meaning of Rule 315(b) because it contain[ed] no recital that it was made under oath." *Roth*, 202 Ill. 2d at 498 (Kilbride, J., concurring in part and dissenting in part). However, in *Roth*, I disagreed with the majority's strict enforcement of Rule 315(b)'s nonspecific attestation requirements when this court "approved as minimally sufficient under Rule 191(a) an affidavit containing no notary attestation or other independent evidence that an oath was administered to the person who signed it." *Roth*, 202 Ill. 2d at 498 (Kilbride, J., concurring in part and dissenting in part), citing *Robidoux*, 201 Ill. 2d at 340. I specifically noted:

"Neither Rule 191(a) nor Rule 315(b) refers directly to notarization or oaths of averment or any other attestation requirement necessary to render the subject document an 'affidavit.' " *Roth*, 202 Ill. 2d at 498 (Kilbride, J., concurring in part and dissenting in part).

Here, the attorney signed the document asserting it was made under oath. The affidavit in this case is more

akin to the affidavit in *Robidoux*, asserting it was made under oath, than the affidavit in *Roth*, lacking any such averment. Accordingly, I would hold that the affidavit in this case sufficiently complied with Rule 315(b) and, therefore, this court has jurisdiction to review the appeal.

This court has treated compliance with Rule 315(b) as jurisdictional. See 214 Ill. 2d at 425; 214 Ill. 2d at 442-43 (Freeman, J., dissenting, joined by McMorrow, C.J.). I agree with Justice Freeman that compliance with our supreme court rules is jurisdictional under section 4 of article VI of the Illinois Constitution (Ill. Const. 1970, art. VI, § 4), and the analysis in today's decision improperly turns to section 16 of article VI (Ill. Const. 1970, art. VI, § 16) (214 Ill. 2d at 427). 214 Ill. 2d at 446-47 (Freeman, J., dissenting, joined by McMorrow, C.J.). Justice Freeman correctly points out that this court's "power to hear and decide cases is separate and distinct from our supervisory power." 214 Ill. 2d at 447 (Freeman, J., dissenting, joined by McMorrow, C.J.). Accordingly, I believe that this court has unnecessarily invoked its supervisory authority to reach the merits of this appeal. I disagree, however, with Justice Freeman's conclusion that the appeal should be dismissed because this court lacks jurisdiction. 214 Ill. 2d at 454 (Freeman, J., dissenting, joined by McMorrow, C.J.).

At the heart of the jurisdictional issue in this appeal is the uncertainty of the affidavit requirement. Filing an affidavit of intent to file a petition for leave to appeal is, technically speaking, jurisdictional.

I agree with Justice Freeman, however, that this court's discretionary enforcement of Rule 315(b) is "profoundly unfair." 214 Ill. 2d at 440, 451 (Freeman, J., dissenting, joined by McMorrow, C.J.). In my view, this court is attempting to overcome the unfairness of strictly enforcing a nonspecific affidavit requirement by unnecessarily exercising its supervisory authority.

The real issue is not the application or enforcement of Rule 315(b). Rather, the unfortunate dilemma is this court's inconsistent interpretation of the nonspecific affidavit requirements of our supreme court rules. See *Robidoux*, 201 Ill. 2d 324; *Roth*, 202 Ill. 2d at 498 (Kilbride, J., concurring in part and dissenting in part).

Justice Freeman has offered a number of alternative proposals to amend Rule 315(b). While I may agree with one or more of his suggestions, I believe it may be more prudent merely to abolish the "affidavit of intent" provision. Instead, Rule 315(b) should be amended to provide that all petitions for leave to appeal must be filed within 35 days unless extended upon order entered pursuant to a timely motion as already provided by Rule 315(b). In the end, a simple overhaul of affidavit requirements in general would be preferable to this court's inconsistent interpretations of affidavits in *Robidoux* and *Roth*. Litigants should not be required to search case law and incur unnecessary fees and costs in unraveling the intricacies of our practice rules to determine the affidavit requirements under a particular rule. Rather, our rules should be clear and straightforward.

For the foregoing reasons I specially concur.

JUSTICE FREEMAN, dissenting:

I cannot agree with the majority on the issue of jurisdiction. I believe that the majority's resolution of this issue not only overrules our own precedent and misconstrues our constitution, but establishes a policy of Rule 315(b) enforcement which is profoundly unfair. Accordingly, I respectfully dissent.

The facts in this case are straightforward. The appellate court filed its opinion in this matter on October 2, 2003. Twenty days thereafter, the County filed in the appellate court a document entitled "Affidavit of Intent to File Petition for Leave to Appeal to the Illinois Supreme Court." On November 6, exactly 35 days after the appel-

late court issued its opinion, the County filed with this court its petition for leave to appeal (PLA). Normally, the County's PLA would have been timely, because filing an affidavit of intent allows a party to file its PLA up to 35 days after the date the appellate court issues its opinion. 177 Ill. 2d R. 315(b). However, the County's affidavit had not been sworn and subscribed to by a notary public, a fact which serves as the genesis of today's jurisdictional debate.

On the day the County filed its PLA, a clerk in our clerk's office noticed the faulty affidavit and contacted an assistant State's Attorney for the County by telephone. Citing this court's decision in *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490 (2002), the clerk informed the assistant that the PLA was untimely because the improper affidavit did not extend the original 21-day period for PLA filing and, as a result, the PLA could not be accepted for filing. According to the affidavit of that assistant, the County sent a motion to this court by overnight courier on Friday, November 7, seeking leave to file its PLA *instanter*. The motion was filed with this court on Monday, November 10. In the motion, the county asked this court to allow it to file the PLA because the County had (i) attempted to comply with this court's rules in good faith, (ii) attempted to rectify promptly its error once the court called it to attention, and (iii) extended considerable time and resources in preparing the PLA. The County stated that although its purported affidavit "admittedly" failed to "include a jurat executed by a notary public" that failure was "inadvertent." The motion, heard by a single justice on behalf of the entire court, was granted on November 19.[3]

---

[3]As will be made clear in the text, I strongly disagree with the majority's conclusion that it is appropriate for this court to excuse violations of our rules of appellate procedure on an *ad hoc* basis. But given that the majority intends to enforce our appeals "rules" on a case-by-case basis (see 214 Ill. 2d at 428-29), I would hope—

In its brief, the District argues that we should follow *Roth* and dismiss the appeal as improvidently granted because the County's PLA did not suffice to confer jurisdiction on this court. The District points out that because the affidavit of intent was not sworn before a notary public, it was ineffective to extend the time for filing the PLA, and thus, the PLA failed to comply with the mandatory time requirements established by the rules of this court. In response, the County concedes that its affidavit was of no effect, but contends that this court's order granting the motion to file the PLA *instanter* extended the time for filing a PLA, as provided in Rule 315, effectively waiving the time limits for the instant appeal.

The majority decides this issue in favor of the County, but on grounds other than the County argued. The majority holds that compliance with the rules for appeals to this court is not a jurisdictional requirement, because this court is free to excuse noncompliance with its own rules. The majority states that our rules "do not place limitations upon" our jurisdiction. 214 Ill. 2d at 428. I disagree with the majority's analysis and conclusion for several reasons.

First, the majority is clearly overruling *Roth*. That case involved a situation identical to the case at bar. There, as here, a litigant filed a purported affidavit of

and I strongly urge—that at the very least, such decisions ought to be made by the full court, not a single justice. Given the majority's analysis, we will surely be charged with treating similarly situated parties in a different manner. (Indeed, as I shall discuss, this has already occurred, comparing the instant case to *Roth*.) But it would deal an even more severe blow to this court's legitimacy if we were to continue in the practice of allowing this particular decision to be made by a single justice and a court observer were able to demonstrate disparate treatment of such motions between judicial districts, based on the different personalities of the individual justices deciding the motions.

intent with the appellate court, then filed a PLA with this court within 35 days but more than 21 days after the appellate court filed its opinion. *Roth*, 202 Ill. 2d at 492-93. There, as here, no notary public witnessed the purported affidavit. And there, as it *should* be here, we dismissed the appeal even though we had already granted leave to appeal. The reason we did so was that the lack of notarization rendered the first document a nonaffidavit, which meant the PLA was late.[4] Therefore we dismissed the appeal because " '[O]ur rules demand strict compliance in the timely filing of appeals or affidavits of intent *as a matter of jurisdiction.*' " (Emphasis added.) *Roth*, 202 Ill. 2d at 496-97, quoting *A.J. Maggio Co. v. Willis*, 197 Ill. 2d 397, 403 (2001).

The majority purports to reaffirm our decisions in *Roth* and *A.J. Maggio Co. v. Willis*, 197 Ill. 2d 397, 403 (2001). See 214 Ill. 2d at 428-29. But the majority's statement that our rules "are not a jurisdictional bar" (214 Ill. 2d at 429) could hardly be more clearly inconsistent with the holding in *Roth* and *A.J. Maggio* that " '[o]ur rules demand strict compliance in the timely filing of appeals or affidavits of intent as a matter of jurisdiction.' " *Roth*, 202 Ill. 2d at 496-97, quoting *A.J. Maggio*, 197 Ill. 2d at 403. Moreover, pardoning the County's clear, unexcused noncompliance with our rules in this case— the County offers no justification for its failure to file a proper affidavit—flies in the face of our previous position that "our rules would have little force if the legal community perceived that we, as a court, do not enforce the rules or tailor them to fit the exigencies of the moment."

---

[4]Under Rule 315(b), if an appellant files an affidavit of intent in the appellate court within 21 days after the appellate court files its opinion, the PLA is not due in this court until 35 days after the appellate court files its opinion. Without a proper affidavit, however, the PLA must be filed in this court within 21 days after the appellate court files its opinion. 177 Ill. 2d R. 315(b).

*Roth*, 202 Ill. 2d at 494. The majority's statement that we "do not, in any way, retreat from" the above statement in *Roth* (214 Ill. 2d at 429) rings startlingly hollow.

But more troubling than the majority's utter disregard for our precedent is its flawed constitutional analysis. The majority touches on a number of constitutional provisions in its segue away from the clear precedent of *Roth* and *A.J. Maggio*. Indeed, the majority mentions nearly every provision having to do with the jurisdiction of Illinois courts, even those which clearly have nothing to do with this case. The majority notes the provisions relating to the original jurisdiction of the circuit court, the appellate court, and the supreme court. 214 Ill. 2d at 426. The majority notes the constitutional provisions for appeals from the circuit court to the appellate court and from the circuit court to the supreme court. 214 Ill. 2d at 426-27. The majority also notes the circumstances—none of which are present in this case—in which there is an appeal as of right from the appellate court to the supreme court. See 214 Ill. 2d at 427. Yet, in remarkable defiance of the law of averages, the majority never focuses its attention upon the single constitutional provision relevant to our jurisdiction in this case, namely, appeals from the appellate court to this court other than appeals of right.

Instead, the majority veers off into a discussion of this court's supervisory and general rulemaking authority. 214 Ill. 2d at 427. Only in this context, in passing, does the majority offhandedly mention that the constitution "enables" this court "to create rules governing appeals from the appellate court." 214 Ill. 2d at 427, citing Ill. Const. 1970, art. VI, §§ 4(c), 6. But section 4 of article VI is the only possible source of appellate jurisdiction in the instant case.

This court's jurisdiction is defined by section 4 of article VI of the Illinois Constitution, which is helpfully

entitled "Supreme Court—Jurisdiction." Ill. Const. 1970, art. VI, § 4. Subsection (a) defines our original jurisdiction, subsection (b) defines our jurisdiction over direct appeals from the circuit court, and subsection (c) establishes our jurisdiction to hear appeals from the appellate court. See Ill. Const. 1970, art. VI, §§ 4(a), (b), (c). Therefore, because the instant case involves an appeal from the appellate court, subsection (c) is the only relevant provision. Accordingly, I believe it is worth setting out in its entirety:

> "Appeals from the Appellate Court to the Supreme Court are a matter of right if a question under the Constitution of the United States or of this State arises for the first time in and as a result of the action of the Appellate Court, or if a division of the Appellate Court certifies that a case decided by it involves a question of such importance that the case should be decided by the Supreme Court. *The Supreme Court may provide by rule for appeals from the Appellate Court in other cases.*" (Emphasis added.) Ill. Const. 1970, art. VI, § 4(c).

The above provision is quite clear. "In other cases" than appeals as of right, we have "jurisdiction" over appeals *as we "provide by rule."* Thus, contrary to the majority's assertion (see 214 Ill. 2d at 428), our rules are, in fact, inextricably bound up with our jurisdiction over appeals from the appellate court. Indeed, the constitutional commentary specifically states, in the comments on a similar provision in section 4(b), that our "jurisdiction" is "subject" to our "rule making powers." See Ill. Const. 1970, art. VI, § 4(b), Constitutional Commentary, at 369 (Smith-Hurd 1993) ("the authority over the Supreme Court's jurisdiction is subject only to the Court's rule making powers and not to legislation").

It is uncontroverted that there is no appeal as of right in the instant case. Therefore, we have jurisdiction over this appeal only as we have provided by rule. And our rules do not provide for appeals when PLAs are filed late because of a faulty affidavit of intent. See *Roth*, 202 Ill.

2d at 497. Thus, we do not have jurisdiction over such appeals, as this court correctly held in *Roth*, following *A.J. Maggio*. And, therefore, we ought to dismiss the instant appeal.

I do agree with the majority that noncompliance with our rules is not a jurisdictional defect in the context of appeals as of right. Our constitution has directly granted us jurisdiction to hear those appeals without any reference to our rules. Ill. Const. 1970, art. VI, § 4(c). But in all other appeals from the appellate court—including, of course, the instant case—our constitutional grant of jurisdiction explicitly references only those appeals for which we have "by rule" provided.

As I mentioned previously, instead of looking to that portion of the constitution which defines our jurisdiction to hear cases, the majority turns to section 16 of article VI, which grants this court "[g]eneral administrative and supervisory authority over all courts." Ill. Const. 1970, art. VI, § 16. The majority notes that our general rulemaking authority is derived from this section. The majority then posits that because our rules are enacted pursuant to our supervisory authority, that same supervisory authority must allow us to break them. 214 Ill. 2d at 428.

I believe this is an erroneous line of reasoning. First of all, our authority to craft rules regarding appeals from the appellate court to this court other than appeals as of right derives from section 4, not section 16.[5] The constitutional commentary specifically notes that "[s]ection 16 was not intended to alter the powers of the

---

[5]The direction in section 16 that this court keep appeals "expeditious and inexpensive" clearly does not require this court to provide for appeals from every decision at every time. Rather, it is an admonition to this court that when an appeal *can* be brought, this court must do its best to clear the obstacles of time and money from *its* path.

judicial and legislative branches with respect to the rule making powers." Ill. Const. 1970, art. VI, § 16, Constitutional Commentary, at 480 (Smith-Hurd 1993). As this court has previously recognized, our power to hear and decide cases is separate and distinct from our supervisory power. See *Administrative Office of the Illinois Courts v. State & Municipal Teamsters, Chauffeurs & Helpers Union, Local 726*, 167 Ill. 2d 180, 192 (1995) (distinguishing supreme court's "authority to hear and decide cases" from our "general administrative and supervisory authority over the courts of this State"). Thus, even if the majority were correct in its conjecture that our supervisory authority permits us to break at will any rules we make pursuant to our supervisory authority, that would not permit our action here, where the rules in question were not established pursuant to our supervisory authority. Moreover, even if this position were defensible, I would strongly urge my colleagues to reject it for the reasons this court endorsed in *Roth* and which the majority avows still to believe: " 'our rules would have little force if the legal community perceived that we, as a court, do not enforce the rules or tailor them to fit the exigencies of the moment.' " 214 Ill. 2d at 429, quoting *Roth*, 202 Ill. 2d at 494-95. Here, indeed, the majority is directly *stating* that we can—and showing by our actions in this case that we *will*—tailor enforcement of our rules to the exigencies or whims of the moment.

It is true that we have previously issued opinions pursuant to our supervisory authority. See, *e.g., McDunn v. Williams*, 156 Ill. 2d 288 (1993). However, until today, this step has only been taken in the most extraordinary circumstances requiring our supervision *over the court system*. In *McDunn*, for example, two candidates were vying for a single judgeship. The appellate court resolved this situation via the somewhat surprising remedy of making them *both* judges. Both parties having gotten

what they wished, neither appealed. We addressed the case nevertheless, because the appellate court's order created an unacceptable situation in the circuit court, which it was entirely appropriate—indeed, *necessary*—for this court to resolve through our supervisory authority over the courts of this state. See *McDunn*, 156 Ill. 2d at 302. The few other occasions on which we have exercised this power have involved similarly compelling circumstances.

By contrast, the instant case involves no matter which might be said even remotely to require exercise of our supervisory authority. It is a straightforward appeal involving a matter of statutory construction, in a dispute having *nothing to do* with any Illinois court. Our "general administrative and supervisory authority" over all Illinois courts ought not to be construed as a license to ignore our rules whenever we like. See 214 Ill. 2d at 428-29. It is an unusual and broad grant of power, but it ought to be invoked with restraint, only when action is required to maintain the integrity of the court system, not to decide cases on a whim when litigants have flubbed our rules regarding appeals. See Ill. Const. 1970, art. VI, § 16, Constitutional Commentary, at 480 (Smith-Hurd 1993) (the addition of the words "and supervisory" to section 16 "were intended to strengthen the concept of central supervision of the judicial *system*" (emphasis added)).

There was a simple, well-established procedure by which the County could have invoked this court's jurisdiction in an appeal from the appellate court's decision. One step in that procedure had to be taken within 21 days after the appellate court's decision: file either a PLA in this court or an affidavit of intent in the appellate court. Rather than filing a PLA, the County chose to file an affidavit of intent. The affidavit requirement of Rule 315(b) is neither unclear nor onerous. Any claim

that the rule is unclear on its face would be irrelevant, moreover, as this court issued its opinion in *Roth* in December of 2002, nearly a year before the County filed its "affidavit" in this case. Our decision in *Roth* made it quite clear that this court's "jurisdiction" turns on compliance with this court's rules, *specifically* the affidavit requirement of Rule 315(b). Indeed, even *more* specifically, we made clear that there were jurisdictional implications when *a Rule 315(b) affidavit of intent is not sworn before a notary public. Roth*, 202 Ill. 2d at 497. This court had held with crystal clarity that the *precise* transgression the County committed in this case was a jurisdictional fault less than a year before the County committed its error.

The majority champions the County's actions as a basis for the result in this case. The majority characterizes the County's motion to file its PLA *instanter* as a "measure[ ] to inform this court its affidavit of intent was defective" (214 Ill. 2d at 429), and lauds the County because "immediately upon discovering the defect in its 'affidavit,' the County notified this court of its situation and requested relief" (214 Ill. 2d at 430). This interpretation of events is bizarre at best. It seems a bit odd, frankly, that I would even have to point out the entirely obvious fact that *this court informed the County of the situation*, not the reverse. The County did not somehow abstractly "become aware" of the defect in the affidavit and take it upon itself to inform this court of a potential jurisdictional problem of the County's own making. Rather, the County simply filed a motion asking this court to excuse its defective affidavit several days after the County received a telephone call *from this court* which *informed the County that its affidavit was defective*. It is logic worthy of Lewis Carroll to suggest that this filing—in the wake of this court's notification to the County that the affidavit was defective—was an effort to "inform

this court that its affidavit was defective" or to "notif[y] this court of its situation." The County did not file its motion to file its PLA *instanter* until after the time for filing the PLA had already passed, and then only because an employee of this court took affirmative action to inform the County of its error.

I acknowledge that dismissing an appeal because of a defective affidavit is a harsh result. However, just two years ago, a majority of this court in *Roth* agreed that dismissal was, in fact, the proper result in such cases in light of our decision in *A.J. Maggio*. In both *Roth* and *A.J. Maggio*, we spoke in terms which left no doubt that our rules regarding appellate procedure had jurisdictional implications. If a majority of my colleagues have changed their minds, and now believes that such a result is indeed too harsh, then the solution, to me at least, is obvious—we should amend Rule 315(b). There are a number of ways in which we could go about amending the rule so as to avoid the result from which the majority now recoils.

Initially, I note that the onus of enforcing Rule 315's affidavit requirement ought not to be on this court, but on the *appellate* court, where the rule requires the document to be filed. In light of this, I believe the initial problem in all of these cases is that the appellate court is not paying sufficiently close attention to the purported "affidavits" filed therein. As we pointed out in *Roth*, the affidavit of intent not only gives notice to the opposing litigant, but also automatically stays the appellate court mandate. *Roth*, 202 Ill. 2d at 495, citing 155 Ill. 2d R. 368. In the aftermath of our decision in *Roth*, the appellate court should have become more vigilant with respect to the propriety of the affidavits of intent filed with it— and refused to accept purported affidavits which fail to satisfy the requirements we there made clear. Thus, if my colleagues wish to ameliorate the harshness of the

dismissal of appeals for affidavit defects, one way to go about it would be to amend the rule to make explicit that the appellate court must refuse to accept nonconforming affidavits in the first instance. In conjunction, we could also amend Rule 315(b) to permit litigants who file a faulty affidavit in the appellate court to seek leave from the *appellate* court or a justice thereof to extend the time for filing an affidavit of intent, in order that disputes over faulty affidavits might be dealt with in the court in which they are filed.

Another approach would be to set out specific requirements for the affidavit within the body of Rule 315(b) so that litigants will know what exactly we expect of them. See *Roth*, 202 Ill. 2d at 496 (contrasting specificity of Rule 191 to the lack of specificity in Rule 315(b)). This would surely temper any concerns about the "unfairness" of enforcing the rule. Or, as a final alternative, this court could wholly do away with the affidavit requirement, or further retreat from it as we did in December 2003, when we amended Rule 315 to permit parties to file with the appellate court a verification by certification (see 735 ILCS 5/1—109 (West 2000)), as an alternative to an affidavit of intent. See Official Reports Advance Sheet No. 26 (December 24, 2003), R. 315, eff. December 5, 2003.

Each of the options I have outlined here would achieve the same result as the majority does, ameliorating the harsh result in this case. My suggestions would change the result by changing the rule, however. This has a considerable advantage, to my mind, over the majority's approach of interjecting uncertainty into the enforcement of our rules, abandoning precedent, and misinterpreting our constitution.

The majority, caught between the Scylla (wishing to enforce our rules) and Charybdis (the fact that our rules clearly require us to dismiss the instant appeal), resolves

its dilemma by holding that this court may enforce our rules selectively, based on naught but whim. The majority's solution is not only unwise, as I have demonstrated above, but also unjust. After all, what conceivable basis is there for excusing the County's late appeal in this case but refusing to excuse the late appeal in *Roth*? Do Illinois governmental entities, such as the appellant in this case, have a greater right to be heard than the private litigant attempting to redress a perceived wrong in *Roth*? It would appear so. For the majority's proffered distinction of *Roth*—that the County *asked us* to excuse its noncompliance with our rules (see 214 Ill. 2d at 429)—is a thin reed indeed. Bear in mind, *Roth* was the first case to interpret the "affidavit" requirement of Rule 315(b). The appellant had no reason to ask us to excuse its noncompliance, as it was not clear that it had not complied—indeed, it had every reason to believe that it *had* complied, given that the appellate court accepted its affidavit and this court not only accepted the PLA for filing, but actually granted leave to appeal. The only reason that the County asked us to excuse its noncompliance in *this* case is the obvious fact that this court took the affirmative step of *contacting the County when the PLA was filed*—something we did *not* do for the private litigant on whom the axe fell in *Roth*. We are clearly treating similarly situated parties in a strikingly different fashion for no good reason. Although we may fend off an equal protection challenge by retreating behind the cloak of exercising our discretion, I am not at all sanguine about the manner in which the majority has chosen to resolve this case, given the wealth of alternatives which do *not* flout our rules or prior precedent. The majority's holding will, I fear, give rise to the appearance that we are exercising our jurisdiction in a manner at best arbitrary and capricious, and at worst biased.

Finally, I note that because it decides that compliance

with our rules is optional, the majority fails to address the argument of the County that its PLA did, in fact, comply with our rules. This argument is based on the provision in Rule 315(b) that "The Supreme Court, or a judge thereof, on motion, may extend the time for petitioning for leave to appeal, but such motions are not favored and will be allowed only in the most extreme and compelling circumstances." 177 Ill. 2d R. 315(b). The County argues that by granting its motion to file its PLA *instanter*, this court in effect extended the time that the County was allowed for petitioning.

I do not believe that the language of the rule supports the County's position in this case. The problem is that the County's motion was only filed *after* the normal time limits had already expired. The plain language of the rule permits this court or a judge thereof to "extend" the time for petitioning, not to "recreate" it. Had the County filed its motion *before* the time limits had expired, matters would be different—I would stand on the County's side on the jurisdiction issue. But this court should not upend appellate practice by resuscitating jurisdiction which has already been lost. To hold otherwise would do away with any pretense of finality of appellate court judgments, for any judge of this court could at any point in time—even years after a final appellate court judgment—enter an order "extend[ing]" the time for filing a PLA, permitting a litigant to reopen a matter long since properly laid to rest. The better practice is that clearly contemplated by our Rule 315(b): a party may request an extension of time by filing a motion requesting it before the deadlines for filing have passed— thus putting the other parties on notice that there may be additional proceedings yet to come before this court.

In his special concurrence, Justice Kilbride agrees that the affidavit requirement is jurisdictional, but suggests that this court ought to find that the affidavit in

this case satisfied the affidavit requirement because it contains the phrase "under oath." 214 Ill. 2d at 438 (Kilbride, J., specially concurring). He believes this fact makes the instant case less like *Roth* and more akin to this court's earlier decision in *Robidoux v. Oliphant*, 201 Ill. 2d 324, 340-43 (2002). This court distinguished *Robidoux* in *Roth*, however, noting that Rule 191, the rule at issue in *Robidoux*, enumerated specific requirements for affidavits submitted pursuant thereto—including that the affidavit be sworn "under oath," but excluding any mention of notary attestation. By contrast, as Justice Kilbride notes, Rule 315(b) is wholly silent on the issue of what is required of affidavits thereunder. 214 Ill. 2d at 438 (Kilbride, J., specially concurring). Accordingly, in *Roth*, this court concluded that in the absence of specific affidavit requirements within the text of Rule 315(b) the *traditional* requirements of affidavits must apply in the context of Rule 315(b)—including the requirement that they be sworn and subscribed before a notary public. I believe this analysis was correct. However, I agree with Justice Kilbride regarding the harshness of dismissing appeals for noncompliance with Rule 315 as it stands, which is why one of the alternatives I suggested earlier in this opinion was to amend Rule 315(b) to the same level of specificity as exists in Rule 191. Therefore, although I welcome Justice Kilbride's concurrence in my conclusion that the affidavit requirement of Rule 315 is jurisdictional, I must respectfully part company with him regarding what is currently required for a document to constitute an affidavit under Rule 315.

Our precedent dictates that we dismiss this appeal as improvidently granted due to the County's failure to comply with Rule 315(b). If such a result is now deemed unworkable or undesirable, then this court should use this case as a vehicle to amend Rule 315 so that the problem is rectified for all future litigants. Because my

colleagues take neither of the above approaches, but instead opt to allow *ad hoc* enforcement of this court's rules, I cannot join in their opinion and I respectfully dissent.

CHIEF JUSTICE McMORROW joins in this dissent.