# Illinois Official Reports

## Appellate Court

---

**Openlands v. Department of Transportation, 2018 IL App (1st) 170340**

---

| | |
|---|---|
| Appellate Court Caption | OPENLANDS, an Illinois Not-for-Profit Corporation, and SIERRA CLUB, a California Not-for-Profit Corporation, Plaintiffs-Appellants, v. THE DEPARTMENT OF TRANSPORTATION, an Illinois State Agency; ANN L. SCHNEIDER, in Her Official Capacity as Secretary of Transportation; THE BOARD OF THE CHICAGO METROPOLITAN AGENCY FOR PLANNING, an Illinois Municipal Corporation; and THE METROPOLITAN PLANNING ORGANIZATION POLICY COMMITTEE, an Illinois Public Agency, Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-17-0340 |
| Filed<br>Rehearing denied | May 23, 2018<br>July 3, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CH-6630; the Hon. David B. Atkins, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Howard A. Learner and Rachel L. Granneman, of Environmental Law & Policy Center, of Chicago, for appellants. |

Lisa Madigan, Attorney General (David L. Franklin, Solicitor General, and Evan Siegel, Assistant Attorney General, of counsel), and Holland & Knight, LLP (Christopher J. Murdoch, of counsel), both of Chicago, for appellees.

Panel                JUSTICE LAVIN delivered the judgment of the court, with opinion. Justices Fitzgerald Smith and Howse concurred in the judgment and opinion.


**OPINION**

¶ 1      Plaintiffs-appellants Openlands, an Illinois not-for-profit, and the Sierra Club, a California not-for-profit, appeal from the trial court's order granting summary judgment to the Illinois Department of Transportation (Transportation Department), the Chicago Metropolitan Agency for Planning (Chicago Metro Planning Agency), and the Metropolitan Planning Organization Policy Committee (MPO Policy Committee). In granting defendants' motion, the court thereby denied plaintiffs' dueling summary judgment motion and sanctioned further progress on the Illiana Tollway project, a proposed 47-mile, billion-dollar tollway, running from Interstate 55 in Illinois to Interstate 65 in Indiana. Plaintiffs have objected on the basis of their taxpayer status and argument that the tollway expenditures violate Illinois law. Their reason for the challenge, however, is that the tollway development and accompanying traffic would allegedly jeopardize the Midewin National Tallgrass Prairie, which runs near the southern boundary of the proposed tollway project. Plaintiffs ask that we reverse the trial court's judgment and grant their motion instead. For the reasons to follow, we affirm.

¶ 2                       BACKGROUND
¶ 3      The Chicago Metro Planning Agency and its governing board (Chicago Metro Planning Agency Board or Board) is a special district "unit of government," which was created by the Regional Planning Act (70 ILCS 1707/1 *et seq.* (West 2014)) to address transportation challenges in northeastern Illinois. The other key player in this case is the MPO Policy Committee, a federally designated organization under the Federal-Aid Highway Act (23 U.S.C. § 101 *et seq.* (2012)) that also addresses local transportation matters. Metropolitan planning organizations (MPOs) exist in urban areas with a population of over 50,000 people and are formed generally by agreement with the governor and units of local government, or otherwise by state or local law. *Id.* § 134(d).

¶ 4      Pursuant to the aforementioned transportation statutes, in March 2007, the Chicago Metro Planning Agency and the MPO Policy Committee entered into a memorandum of understanding identifying the "working relationship between the two boards" with respect to the northeastern transportation system, acknowledging that both state and federal law controlled. The agreement covered the geographic "metropolitan planning area as defined by the Regional Planning Act" and by federal regulations and thus included northeastern

counties, plus additional counties under the MPO Policy Committee's authority. See *id.* § 134(b)(1), (e); 23 C.F.R. § 450.104 (2014) (defining "metropolitan planning area" as that defined by the MPO and governor to identify where the metropolitan transportation planning is carried out); 23 C.F.R. § 450.312(a) (2014) (the metropolitan planning area encompasses the entire urbanized area plus any contiguous area expected to become urbanized within a 20-year period and the metropolitan planning area may be further expanded to encompass a statistical area defined by the federal budget office).[1]

¶ 5    Consistent with the statutes, the parties agreed that the Chicago Metro Planning Agency Board would develop "an integrated comprehensive regional plan" and the MPO Policy Committee would develop "long-range transportation plans and transportation improvement" for the Chicago metro area. Indeed, federal statutes provide that an MPO must adopt both long-range "metropolitan transportation plans," with a planning horizon of 20 years, known as MTPs, and short-range "transportation improvement programs," known as TIPs, which are updated every four years, in metropolitan areas. See 23 U.S.C. § 134(c)(1) (2012); 23 C.F.R. §§ 450.322(a), 450.324(a) (2014). For federal funding, the transportation project must be included in both the long- and short-range planning for the region. See 23 U.S.C. § 134(c) (2012).

¶ 6    The memorandum of understanding between the parties stated that "federal regulations require the MPO to approve various plans, programs and related documents" but that the Chicago Metro Planning Agency Board would be the body to *develop* those plans, programs, and documents. The Chicago Metro Planning Agency Board was to receive input and recommendations from various groups/committees, and the Board "will then forward its recommendation with comments to the [MPO] Policy Committee, which will act upon that recommendation. The [MPO] Policy Committee will take final action as required by federal law." A footnote in the memorandum of understanding document states it was subsequently reaffirmed in 2009, 2010, 2012, 2013, and 2015. Finally, the footnote says it was revised and affirmed in March 2015 as well (although it is unclear as to what was revised).[2]

¶ 7    Here, in 2010, the MPO Policy Committee adopted a long-range metropolitan transportation plan, which apparently also encompassed a short-range forecast, called the "GO TO 2040" plan, which the Chicago Metro Planning Agency Board likewise determined would serve as its comprehensive regional plan. According to a federal report, the "GO TO 2040" was Chicago's first comprehensive regional plan in more than 100 years, addressing an array of issues like transportation, housing, economic development, open space, the environment, and quality-of-life matters in the region's 284 communities.

[1] While a 1981 document signed by the Illinois governor designated the MPO's geographic metropolitan planning area to be "the urbanized areas of Chicago, Aurora-Elgin, and Joliet," we presume the metropolitan planning area identified in the 2007 memorandum of understanding eclipsed this document.

[2] The 2014 agreement echoed earlier agreements from 1955 and 1968 between the City of Chicago, Cook County, and the State of Illinois, through the Department of Public Works and Buildings. In those memorandums of understanding, the parties likewise aimed to study traffic patterns so as to relieve the Chicago metro area of traffic and congestion problems. The 1955 agreement stated the parties would take a 50% portion of federal aid via the federal highway program, and in the 1968 agreement, a 75% portion. The MPO in the Chicago region was previously called the Chicago Area Transportation Study (or CATS).

¶ 8        Several years later, in 2013 and 2014, the Transportation Department sought to amend the "GO TO 2040" plan to include the Illiana Tollway project. See 23 C.F.R. § 450.104 (2014) (an "amendment" is a "revision to a long-range statewide or metropolitan transportation plan, [and] TIP" and includes "the addition *** of a project," requiring public review and comment). The Chicago Metro Planning Agency voted against this amendment, while the MPO Policy Committee voted contrarily to include the Illiana Tollway in the "GO TO 2040" plan and also voted to approve the short-term plan to include the Illiana Tollway.[3] In addition, the head of the Transportation Department similarly voted in favor of the amendments, having obligated about $40 million in state funds towards the Illiana Tollway with a proposed investment of much more and with the concomitant goal of obtaining federal financial aid. In their briefs, the parties have not parsed out exactly how the "GO TO 2040" plan or the tollway project would be funded. Nonetheless, they have stated that the Illiana Tollway is a "fiscally constrained" capital project, meaning that both the long- and short-term federal plans contain "sufficient financial information for demonstrating that projects" in the plan "can be implemented using committed, available, or reasonably available revenue sources." See *id.* The parties likewise have not identified exactly how the tollway project would be constructed, such as who would oversee the building project, actually build the tollway, or the exact role of the Transportation Department in the project. Nor have they detailed exactly how the governing boards plan to negotiate transportation matters with Indiana. In short, the briefs give short shrift on details in this very niche area of law.

¶ 9        In any event, following the MPO Policy Committee's vote in favor of the Illiana Tollway, plaintiffs filed suit, ultimately landing on an amended complaint for declaratory and injunctive relief to preclude the tollway's development in an effort to protect the Midewin National Tallgrass Prairie and other natural resources they claimed would be adversely impacted by the tollway project. Plaintiffs alleged that the Chicago Metro Planning Agency Board violated section 60(c) of the Regional Planning Act (70 ILCS 1707/60(c) (West 2014)) by failing to adopt a regional transportation decision-making process to ensure that all MPO plans, reports, and programs were approved by the Chicago Metro Planning Agency Board prior to final approval by the MPO Policy Committee. As a result, the MPO Policy Committee had "no authority to consider or approve" the Transportation Department's amendments to the "GO TO 2040" plan to include the Illiana Tollway as a "fiscally constrained" capital project. Accordingly, they claimed the MPO Policy Committee's vote to amend the plan was not authorized under section 60(c) and hence any development was not authorized. Plaintiffs claimed they would be harmed as taxpayers due to the illegal use of public funds and their use of natural resources adversely affected.

¶ 10       The Transportation Department filed an amended answer to the complaint and asserted affirmative defenses. It contended the metropolitan transportation plan amendment was proper and valid, while also admitting to continue state fund expenditures in planning for the Illiana Tollway.

---

[3]The Federal Highway Administration, in its 2014 report certifying the Chicago transit region's compliance with federal requirements, acknowledged that the parties had reached conflicting decisions on whether to include the Illiana Tollway project in the "GO TO 2040" plan. In spite of this, the review found the Chicago metro area to be in compliance with federal requirements.

- 4 -

¶ 11 The parties then filed cross-motions for summary judgment. As in their complaint, plaintiffs claimed the amendments to the "GO TO 2040" plan violated the Regional Planning Act and were unauthorized, void, and without legal effect. They argued the Transportation Department was barred from developing the tollway and asked that the trial court declare the MPO Policy Committee vote void and Transportation Department expenditures unauthorized with an injunction against further spending.

¶ 12 The Transportation Department filed a motion for summary judgment in response. The Chicago Metro Planning Agency Board together with the MPO Policy Committee also filed a separate summary judgment motion. As with its affirmative defense, the Transportation Department asserted that plaintiffs' state law claims were preempted by the Federal-Aid Highway Act. It contended section 60(c) of the Regional Planning Act could not limit the MPO Policy Committee's federally prescribed procedure of adopting long- and short-range plans for the Chicago metro area. As such, it argued section 60(c) was unenforceable. The Chicago Metro Planning Agency Board and the MPO Policy Committee added that the approval power conferred through section 60(c) was "advisory" and not binding. They argued this interpretation preserved the constitutionality of the statute and avoided any possible preemption problem. Citing the 2007 memorandum of understanding, which was reaffirmed in 2015, the Chicago Metro Planning Agency Board argued it would defer to the MPO Policy Committee's authority in relationship to approving the Illiana Tollway project.

¶ 13 In the trial court's written order addressing the parties' summary judgment motions, the trial court first noted that in January 2015, the governor had halted the Illiana Tollway by executive order but that, according to the Transportation Department, the tollway was still identified in the long-range plan and the Transportation Department would be prepared to move forward with the project at any time. Finding the issue was not moot, the trial court proceeded in its analysis, ultimately siding with the defendants. The court declared the issue before it was whether section 60(c) of the Regional Planning Act was preempted by federal law. After noting that the MPO Policy Committee was a creature of federal law, the court found that "Permitting [the Chicago Metro Planning Agency] to have unfettered power to screen off transportation projects that receive federal money would necessarily impede on the MPO's federally empowered discretion in approving highway projects." The court concluded the plaintiffs' interpretation of the Regional Planning Act would conflict with the Federal-Aid Highway Act. The court held the Transportation Department's disbursal of funds for the tollway project would not be illegal.

¶ 14 Plaintiffs appealed.[4]

¶ 15                                              ANALYSIS

¶ 16 Plaintiffs now challenge the trial court's judgment denying their summary judgment motion and granting that in favor of defendants. The Transportation Department filed a

---

[4]In June 2015, plaintiffs won a summary judgment motion in federal court declaring that the Federal Highway Administration's approval of a tier 1 environmental impact statement for the proposed Illiana Expressway was arbitrary and capricious and in violation of the National Environmental Policy Act. See *Openlands v. United States Department of Transportation*, 124 F. Supp. 3d 796, 810 (N.D. Ill. 2015). The matter was remanded for further administrative proceedings. *Id.* at 810-11.

response brief, as did the Chicago Metro Planning Agency Board together with the MPO Policy Committee. Where, as here, parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. That said, however, the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment. *Id.* Summary judgment should be granted only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law. *Id.* ¶ 29; 735 ILCS 5/2-1005(c) (West 2014). Where a case is decided through summary judgment, our review is *de novo*, and we may affirm the trial court's decision for any reason in the record. *Moline School District No. 40 Board of Education v. Quinn*, 2016 IL 119704, ¶ 15; *Parker v. House O'Lite Corp.*, 324 Ill. App. 3d 1014, 1020 (2001).

¶ 17     As below, plaintiffs' primary contention on appeal is that the MPO Policy Committee lacked the authority to amend the "GO TO 2040" plan to include the Illiana Tollway project. To address this contention, we first turn to the statutes themselves.

¶ 18     Metropolitan transportation planning falls under section 134 of the Federal-Aid Highway Act (23 U.S.C. § 134 (2012)). As set forth above, the MPO for the northeastern Chicago region was created by agreement pursuant to state law, as both the Chicago Metro Planning Agency and the MPO Policy Committee entered into a memorandum of understanding. See *id.* § 134(d)(1). Each MPO consists of local elected officials, officials of public agencies involved with major metro transportation modes, and appropriate state officials, and moreover, to effect transportation planning, states can enter into interstate compacts. See *id.* § 134(d)(2), (f). The MPO for the Chicago region is specifically made up of a member from the Council of Mayors, the Regional Transportation Authority, the Chicago Department of Transportation, the Transportation Department, the Metra, the Illinois State Toll Highway Authority, the Chicago Transit Agency, northeastern counties (identified *infra* ¶ 22), Pace, private providers, railway companies, the Federal Transit Administration, the Federal Highway Administration, and two members from the Chicago Metro Planning Agency.

¶ 19     Each MPO retains a national interest in promoting safe and efficient management, operation, and development of transportation between states and urbanized areas. 23 U.S.C. § 134(a)(1) (2012). Generally, an MPO's goal is to plan projects that support economic vitality in the region, increase transportation safety, and protect and enhance the environment, among other things. See *id.* § 134(h)(1). The planning process is "performance-based" consistent with the national goals of safety, infrastructure maintenance, congestion reduction, and environmental sustainability, et cetera. See *id.* §§ 134(h)(2), 150(b). MPOs may deal with more than one metro planning area and also must coordinate and consult with officials responsible for other transportation matters on the state or local level. *Id.* § 134(g)(3). In addition, they must integrate other states' transportation plans into their own. *Id.* § 134(h)(2)(d).

¶ 20    As stated, to accomplish its interstate and intrastate transportation goals, the MPO, while cooperating with state and public transportation operators,[5] must adopt both a 20-year long-range and a 4-year, short-range transportation plan in metropolitan areas. See *id.* § 134(c)(1); 23 C.F.R. §§ 450.322(a), 450.324(a) (2014). The long-range transportation plan must include such things as a performance report, a financial plan identifying public and private funding sources available, and coordinate with Clean Air Act (42 U.S.C. § 7401 *et seq.* (2012)) agencies. 23 U.S.C. § 134(i)(2), (3) (2012). The long-range plan requires coordination with various state and local agencies, and the MPO also must allow for public comment, in addition to publishing the plan for all to review. *Id.* § 134(i)(6). A short-range plan similarly must have a financial forecast, be consistent with the long-range plan, provide for notice and comment by interested parties, and be published for public review. *Id.* § 134(j). For federal funding, the transportation project must be included in both the long- and short-range planning for the region, and the federal secretary of transportation must certify that the planning process of each MPO is being carried out in accordance with federal law and that the short-term plan has been approved by the MPO and governor. See *id.* § 134(c), (j), (k).

¶ 21    Thus, as has been stated, each state-designated MPO holds the sole responsibility for developing via solicitation of member municipalities, endorsing, and submitting to the federal secretary of transportation all project requests for the use of Highway Trust Funds apportioned to the subdivisions within the MPOs' regional jurisdiction. *County of Los Angeles v. Coleman*, 423 F. Supp. 496, 498 (D.D.C. 1976).

¶ 22    Turning to the state provisions at issue, the purpose of the Regional Planning Act is to describe the powers and responsibilities of the Chicago Metro Planning Agency, "a unit of government" created to address transportation challenges in northeastern Illinois (including Cook, Du Page, Kane, Kendall, Lake, McHenry, and Will Counties). 70 ILCS 1707/5, 10 (West 2014). A unit of local government includes counties, municipalities, townships, special districts, and units designated by law as having limited governmental powers. Ill. Const. 1970, art. VII, § 1[6]; *Blanchard v. Berrios*, 2016 IL 120315, ¶ 41. Here, the Regional Planning Act is included in Chapter 70, entitled "special districts," of the Illinois statutes, presumably because the Chicago Metro Planning Agency provides a single service of regional transportation planning and serves as a "political subdivision, body politic, and municipal corporation." 70 ILCS 1707/15(a) (West 2014); see *Pace v. Regional Transportation Authority*, 346 Ill. App. 3d 125, 142 (2003) (a special district is a relatively autonomous local government that provides a single service). Special districts, like the Chicago Metro Planning Agency, are creations of the legislature and thus the statutes granting them power are to be strictly construed; their powers are not to be enlarged by construction. *Baker v. Forest Preserve District*, 2015 IL App (1st) 141157, ¶ 39. While plaintiffs appear to consistently suggest that the Chicago Metro Planning Agency is a "state agency," and cite various cases

---

[5]A "public transportation operator" is "the public entity which participates in the continuing, cooperative, and comprehensive transportation planning process" under section 134 and "is the designated recipient of Federal funds" generally for transportation. 23 C.F.R. § 450.104 (2014).

[6]Also, by its terms, the 1970 Illinois Constitution recognizes three categories of state and local government in Illinois—the State and its agencies, units of local government, and school districts. Ill. Const. 1970, art. VII, § 1.

with regard to agency law, the statutes make clear that it is a special district unit of local government.

¶ 23    The Chicago Metro Planning Agency Board, which is the legislative body responsible for funding and implementing the transportation planning, consists of 15 voting members from the various northeastern-region counties and City of Chicago, appointed by local government for four-year terms. 70 ILCS 1707/15, 25 (West 2014). The Chicago Metro Planning Agency's duties include providing a "policy framework under which all regional plans are developed," coordinating "regional transportation and land use planning," and identifying and promoting "regional priorities." *Id.* § 20. The Board's jurisdiction is limited to the northeastern region, although the board can enter into agreements with other units of local government outside but contiguous to its jurisdiction. *Id.* § 30. However, the Regional Planning Act states that, "For activities related to the MPO, the jurisdiction of the MPO shall be that area defined by federal requirements." *Id.* The Board can sue and be sued; enter into agreements with local governments, transportation agencies, state agencies, federal agencies, and people in order to implement the Regional Planning Act; accept and expend funds and moneys; enter into contracts; purchase real or personal property; and exercise any implied powers that are necessary or convenient for the Board to accomplish its purposes and that are not inconsistent with its express powers, among other things. *Id.* § 35.

¶ 24    One of the Board's primary duties is to create a regional comprehensive plan every five years (or consistent with federal law) for land use and transportation while also identifying and advocating for regional priorities. *Id.* §§ 45, 50. To that end, the Board must work cooperatively with other entities including units of local government, citizens, and environmental groups, and the plan must include forecasts for the overall growth and change in the region, land use, and transportation policies, along with a 20-year planning forecast, and a listing of public investment priorities, among other things. *Id.* § 45. The plan is to "present the goals, policies, guidelines, and recommendations to guide the physical development of the Region," and any "elements" of the plan relating "to transportation shall be developed cooperatively with the [MPO] Policy Committee." *Id.* Each local government, transportation agency, and state agency must cooperate with the Board, providing any information requested. *Id.* § 51. This, for example, is to create consistency between municipal or county plans and the Board's regional plan. *Id.* In cooperation with the MPO Policy Committee, the Board must adopt a transportation financial plan. *Id.* § 55. To carry out the powers and purposes of the Chicago Metro Planning Agency, the Board can seek federal funding from the MPO or nontraditional federal funds, as well as from state, regional, and local sources. *Id.* § 62.

¶ 25    Section 60 of the Regional Transportation Act recognizes that the MPO Policy Committee is "federally designated" for the Chicago region to approve "all plans, reports, and programs required of an MPO." *Id.* § 60(a). Section 60 also states that its intent is for federal transportation and investment decisions to be "fully integrated into the regional planning process." *Id.* § 60(b). At issue in this case is subsection 60(c), which specifically states:

> "The Board, in cooperation with local governments and transportation providers, shall develop and adopt a process for making the transportation decisions that require final MPO approval pursuant to federal law. That process shall comply with all applicable federal requirements. The adopted process shall ensure that all MPO plans, reports,

and programs shall be approved by the CMAP Board prior to final approval by the MPO." *Id.* § 60(c).

¶ 26     Plaintiffs hang their hat on the language of section 60(c) requiring that the Chicago Metro Planning Agency Board approve all MPO plans, reports, and programs *prior to final approval* by the MPO Policy Committee. Plaintiffs argue that the language of this clause, which utilizes "shall," is clear and unambiguous. Thus, in this case, they argue the MPO Policy Committee's vote to include the Illiana Tollway in the short- and long-range regional planning was nullified by the Chicago Metro Planning Agency Board's vote to exclude it. Plaintiffs assert that further development of the Illiana Tollway is prohibited. Defendants respond that plaintiffs' interpretation of section 60(c) renders the statute ambiguous and internally inconsistent, and they further assert that the language delineating the groups' separate responsibilities is directory.

¶ 27     The word "shall" generally indicates the legislature's intent to impose a mandatory obligation. *People v. Robinson*, 217 Ill. 2d 43, 50 (2005); *Pace*, 346 Ill. App. 3d at 140. The term does not have a fixed or inflexible meaning, however, and may be given a permissive or directory interpretation depending on the legislative intent. *Pace*, 346 Ill. App. 3d at 140. "If the provision merely directs a manner of conduct to guide officials or is designed to secure order, system, and dispatch in proceedings, it is generally directory." *Id.* In other words, we presume commands to government officials regarding procedure are usually directory, but this presumption is overcome when there is negative language prohibiting further action in the case or when the official's failure to follow the procedure will generally injure the right the procedure was designed to protect. *People v. Delvillar*, 235 Ill. 2d 507, 517 (2009); *Robinson*, 217 Ill. 2d at 56. As such, when a statute expressly prescribes a consequence for failure to obey a statutory provision, that is very strong evidence the legislature intended that consequence to be mandatory. *Robinson*, 217 Ill. 2d at 54.

¶ 28     Whether a statutory command is mandatory or directory is a question of statutory construction, which we will also review *de novo*. *Id.* The answer is a matter of legislative intent, for which we turn to the language of the statute, which must be read in its plain and ordinary meaning while keeping in mind the subject the statute addresses and apparent intent of the legislature in enacting it. *Id.*; *In re M.I.*, 2013 IL 113776, ¶ 15; *Wauconda Fire Protection District v. Stonewall Orchards, LLP*, 214 Ill. 2d 417, 430 (2005). We also must presume that several statutes relating to the same subject—in this case, regional transportation planning—are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and harmonious. *Uldrych v. VHS of Illinois, Inc.*, 239 Ill. 2d 532, 540 (2011). Moreover, when the spirit and intent of the legislature are clearly expressed and the objects and purposes of a statute are clearly set forth, courts are not bound by the literal language of a particular clause of the statute that might defeat such clearly expressed legislative intent. *Id.*

¶ 29     Here, reading the federal and state statutes together, considering their overall intent and the language of section 60(c), we conclude that the legislature's use of the word "shall" with regard to the Chicago Metro Planning Agency Board's approval process was directory, rather than mandatory.[7] First, there is no negative language prohibiting further action if the

---

[7]We reject plaintiffs' assertion that the mandatory-directory argument was forfeited because it was not raised below. Contrary to this contention, the Chicago Metro Planning Agency Board and also the

Chicago Metro Planning Agency Board *does not* first approve of all MPO plans, reports, and programs. In fact, the Regional Planning Act contains numerous directives employing the word, "shall," without identifying consequences for failing to enforce the obligatory language. For example, the Board "shall be responsible for developing and adopting a funding and implementation strategy for an integrated land use and transportation planning process"; the Board "shall create a Wastewater Committee"; the Board "shall develop, implement, and maintain a process" for public participation; the Chicago Metro Planning Agency "shall be the authoritative source for regional data collection" and its "official forecasts shall be the foundation for all planning in the region"; the Chicago Metro Planning Agency Board "shall be responsible for identifying regional priorities"; and, finally, each "local government, transportation agency, and State agency shall cooperate with and assist the Board in carrying out its functions." 70 ILCS 1707/15(a), 15(e)(1), 40(a), 44, 50(a), 51 (West 2014). The use of the word "shall" throughout the statute thus directs the Chicago Metro Planning Agency and its Board in their conduct while securing order and dispatch in how they are to proceed. The statute, as written, is clearly a blue print for how government officials are to proceed. While we are not called upon to decide whether the above-stated sections of the Regional Planning Act are mandatory or directory, we observe that the frequent use of the word "shall" throughout the statute indicates that the word cannot always be given a mandatory reading. No one has developed an argument that failure to abide by these provisions would result in the cancellation or suspension of a planned project, let alone a project approved by a federally-designated entity like the MPO Policy Committee. We find section 60(c) no different in its governmental directives. There are no specific consequences cited for the Chicago Metro Planning Agency Board's failure to first approve the MPO's plans, reports, and programs. See *In re M.I.*, 2013 IL 113776, ¶ 16 (noting a directory reading acknowledges that no specific consequence is triggered by failure to comply with the statute).

¶ 30        Second, plaintiffs have not identified a right that is being injured by the Chicago Metro Planning Agency's failure to first approve of all MPO plans, reports, and programs. The procedure in the Regional Planning Act sets forth that the Board is to act cooperatively with the MPO Policy Committee in creating a process for making transportation decisions, while also complying with all federal requirements. Those federal requirements, under the Federal-Aid Highway Act, state that all MPOs are to offer final approval of long- and short-range transportation plans. Nothing in the Regional Planning Act identifies what the Chicago Metro Planning Agency's "process" must entail, whether it be votes by the governing body or something more or less. Likewise, nothing in section 60(c) says that failure to obtain an affirmative vote by the Chicago Metro Planning Agency Board *prohibits* the MPO Policy Committee from reaching and implementing its own decision. We find that section 60(c), rather than requiring first a positive yes vote for MPO plans from the Chicago Metro Planning Agency Board, requires only that the two governing bodies act cooperatively together. A more reasonable reading of the statute is that the Chicago Metro Planning

MPO Policy Committee argued extensively in their summary judgment motion that the Chicago Metro Planning Agency Board's approval power under section 60(c) was advisory. Plaintiffs could easily anticipate a directory reading of the statute from that argument. What's more, plaintiffs have asked us to interpret section 60(c) of the Regional Planning Act. We have done so using the mandatory-directory dichotomy, which is a canon of statutory interpretation that cannot be forfeited. *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 462 (2010).

Agency Board's approval of all MPO plans, reports, and programs is meant to ensure that the MPO Policy Committee is aware of any local assent or dissent relating to MPO matters. The "approval" is not carried out for the purpose of authorizing the MPO Policy Committee's actions. See *People ex rel. Illinois Department of Corrections v. Hawkins*, 2011 IL 110792, ¶ 23 (courts are not bound by a statute's literal language if it produces absurd or unjust results not contemplated by the legislature).

¶ 31     Our interpretation of the statute is consistent with the 2015 memorandum of understanding that has been in place between the MPO Policy Committee and the Chicago Metro Planning Agency for a number of years. Per that agreement, the Board is to forward recommendations to the MPO Policy Committee, but the MPO Policy Committee is to "act" on the recommendations and "take final action as required by federal law." We also find it persuasive that the Chicago Metro Planning Agency Board, the special district unit of local government in charge of regional planning, interprets its own authority as secondary to the MPO Policy Committee. It does not claim to have primacy over transportation decisions by the MPO Policy Committee.

¶ 32     Examining the state and federal statutes more broadly, this makes sense. While MPOs are created pursuant to state or local law, they are ultimately creatures of the federal government. The parties have not identified the number of MPOs that exist among the various urbanized areas in the United States, but we presume there are many. These MPOs are tasked with managing transportation in the regional area but also maintaining consistency among the various MPOs across the country and also with federal environmental regulations. They thus have broader policy and jurisdictional reach than the Chicago Metro Planning Agency. This much is reflected in the MPO Policy Committee's governing body makeup, which includes among its board members not just the northeastern counties that form the Chicago Metro Planning Agency, but other state, local, and federal transportation agencies, as well as two members of the Chicago Metro Planning Agency. The MPO Policy Committee thus represents the interests of the entire State of Illinois and also interstate interests, while the Chicago Metro Planning Agency's interests are confined to the northeastern counties.

¶ 33     Given the intent of the Congress to offer MPOs long-standing, broad authority over their regional urban planning areas, it would make little sense for the Illinois legislature to create a statute allowing a special district unit of local government to effectively preempt the federal provision. Were we to hold otherwise, any special district unit of local government could block an interstate project, preventing MPOs from fulfilling their federal objective of providing metropolitan transportation plans in their jurisdictional area. Rather than finding the Regional Planning Act at odds with this objective, we find our interpretation of the statute shows it is consistent with it.

¶ 34     Likewise, by holding that the statute is clear and unambiguous in providing that all transportation plans require first and final approval only by the MPO, we need not address the parties' arguments that section 60(c) is constitutionally preempted by federal law. When state law conflicts with a federal statute, state law is preempted by the supremacy clause and its application is unconstitutional. *Board of Education, Joliet Township High School District No. 204 v. Board of Education, Lincoln Way Community High School District No. 210*, 231 Ill. 2d 184, 195 (2008). However, we have a duty to avoid constitutional questions whenever possible. *In re E.H.*, 224 Ill. 2d 172, 180 (2006). Likewise, if it is reasonably possible to construe the challenged statute in a manner that preserves its constitutionality, we have a

- 11 -

duty to do so. *People v. Melongo*, 2014 IL 114852, ¶ 20. Our directory reading of section 60(c) does just that, while also strictly construing the Regional Planning Act so as not to enlarge the powers of the special district, as required. See *Baker*, 2015 IL App (1st) 141157, ¶ 39.

¶ 35    In reaching this conclusion, we also reject plaintiffs' claim that the MPO Policy Committee is a "board within" the Chicago Metro Planning Agency. The statutes make clear that these are two separate legal entities, as does the very evidence on which plaintiffs rely. The Federal Transportation Administration certification review, for example, states "The MPO Policy Committee and the Chicago Metro Planning Agency Board are independent entities but work at the policy level to review staff and committee work to ensure consistency and consensus are achieved." Plaintiffs also maintain that the MPO Policy Committee's use of the Chicago Metro Planning Agency offices or resources somehow converts the MPO Policy Committee into a body subject to the Chicago Metro Planning Agency. However the federal regulations specifically contemplate that MPOs may use "the staff resources of other agencies, non-profit organizations, or contractors to carry out selected elements of the metropolitan transportation planning process." 23 C.F.R. § 450.310(f) (2014). That the Chicago Metro Planning Agency and the MPO Policy Committee must act collaboratively does not make them one and the same entity under the law, nor as plaintiffs suggest, does it make the Chicago Metro Planning Agency hold higher authority over the MPO Policy Committee.

¶ 36    Finally, we note that to the extent plaintiffs make certain assertions throughout their brief without citation to legal authority or development of argument, we have declined to address them. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2017) (an appellant must set forth contentions on appeal and the reasons therefore, with citation to the authorities and the pages of the record relied on); *Marzouki v. Nagar-Marzouki*, 2014 IL App (1st) 132841, ¶ 12 (issues must be clearly defined and supported by pertinent authority and failure to develop an argument results in waiver). Plaintiffs, for example, assert defendants violated the Public Private Agreements for the Illiana Expressway Act (605 ILCS 130/1 *et seq.* (West 2014)), which was enacted in 2010, but, aside from citing one section of the statute, have not developed any argument with supporting legal authority for their claim. In addition, given our holding, we need not address plaintiffs' remaining contention that the trial court erred in failing to specify its findings of unconstitutionality. |

¶ 37                                CONCLUSION

¶ 38    For the foregoing reasons, we affirm the judgment of the circuit court granting summary judgment in favor of defendants and against plaintiffs, albeit based on different grounds.

¶ 39    Affirmed.